May it please the Court, Your Honor. Suzanne Luban for Mr. Morris. I'd like to reserve two minutes for rebuttal, and I'd like to focus on the Feretta issues due to the limited time. So the first aspect of my client's – the fact that his waiver of counsel was not knowing and intelligent is kind of a simple question. It's easily ascertained by reading the transcript. He entered part of his plea at the insistence or the questioning of the judge by admitting three violent, serious priors, which are elements of this third-strike offense, before he was told he has a constitutional right to counsel and before he waived his right to counsel. So the – this issue starts on page 48 of my excerpt of records. I think the first question, although it may be totally irrelevant, but his position when he stood up there was, you know, I don't care about this. I already have three life sentences. This doesn't matter. Well, why isn't he right about that? Does it matter? Does this matter? It matters. It has an effect on the standards of his imprisonment or his – I wondered about that. The conditions – yes, he's subject to greater lockdown. He's been locked down for nine months at a time. At present, he is locked down, and that has to do with his classification. So, yes, there is an impact on him. You mean if he goes from two lives to three lives, they change the classification Well, Your Honor, I don't know specifically whether they change it depending on when he gets a new – a life sentence, but he has a conviction for possession of a sharp instrument by a prisoner, and that added points to his – I understand that. My experience with the prison system from other cases indicates that there are four levels, and you're indicating that when he's at four, he gets something, four-and-a-half or something. Do you have something in the record that tells us that? You're just – you're guessing. It's more the issue that I understand that the prison looks at those things, but no, it's not part of the record. And notwithstanding that, he had a constitutional right to have counsel or to have intelligently waived his right to counsel. Well, I understand that, but the issue was does it matter. And clearly, when you read what he said, at least at that time, he didn't think it was going to matter. So if it does matter, I'd like to know where it is in the record. But I take it it's not in the record. It's not in the record, the impact on the conditions of his imprisonment. However, due to this individual's psychological state, which is – I'm not going to have time to get to that issue, but his judgment in terms of what – Well, if it's in the record, I'll go read it. No, I'm sorry. I don't – I don't have something about that issue. But – so the Court elicited his admissions to the priors, and the only comments made about the – about counsel, and he's not in – he's not told he has the right to counsel. He's just told the Court can appoint counsel for him if he'd like, and that counsel could tell him what's going on in his case, which is not a proper advisement as to the right to counsel or the usefulness of counsel. So just on that ground alone, the district court was unreasonable. So I – so your main position is that he wasn't advised at the requisite time because he'd already made an admission. That's my first position, my first argument. I can't say it's my main argument. It's not really about a Ferretta right in the sense of advising him about whether he should represent himself. It's really about advising him whether he had a right to counsel. That's correct. And so Ferretta says – Not Ferretta as such. Is there a Miranda problem? No. This is a Ferretta issue. He's supposed to be told that he has the right to counsel, the nature of the charges and penalties, and the hazard – he's supposed to know or be informed of the hazards of self-representation. So the government overstates or oversimplifies Tovar, I-over-to-Tovar, by saying that Tovar forecloses the requirement of any other advisements, and that's not a correct reading of that case. As – But as I understand your position, it's that even if they're right about that, he still didn't even get anything at the requisite time because he'd already made an admission. That's the first part, yes. I do hold – I do argue that, and that was my first argument. And now I want to go on to the issue of, if you get past that, the – that Tovar says that depends on the circumstances of the defendant, or depends on the record, as to whether the record shows that that defendant knew through some other means or demonstrated his knowledge of the hazards of the – of proceeding without counsel and the usefulness of counsel, the utility of counsel. And so Patterson instructs the Court to look at what would be the utility of counsel. Well, in a third-strike case, where the person is looking at a life sentence, counsel would likely have said, let's wait and see what their evidence is against you, because this is his first appearance. He's never appeared in court before. So you look at the record. Does it show that he intelligently waived his right to counsel? He doesn't bring up the issue of wanting to represent himself. The court clerk says that he was supposed to get a Feretta form, which never appears in the record. The form is not read to him. It's clear that he never did receive what the court calls a Feretta form, which would have explained his right to counsel. Instead, the court goes through his change of plea form and tells him to initial after the fact. And if you want to look at the change of plea form, you can see that the defendant did not initial opposite the section where the judge wrote in that he waives the right to counsel, because there wasn't a line there. And she told him to just go ahead afterwards and sign your initials everywhere where there's a line. So his initials on there don't indicate his understanding of those that he's waiving those rights or what those rights were. Rather, he's following the instructions of the judge and puts his initials on every place where there is a line, including one of the rights that actually or one of the things that doesn't even happen, because he says, like, it says in Number 7 where she crosses it out, it says, I have discussed all these facts and consequences with my attorney. And he signs his initials there because there's a line there. So clearly, he didn't have a lawyer. We, yes, we know he didn't have a lawyer. But where – what is the case that says that you have to discuss the pitfalls? Now, when I was a district judge, I did it only because I thought it was a good idea, and I understand that. But suppose I left it out, as your opposition says, that there was only – Iowa v. Tovar only calls for three areas where there has to be discussion and points out that those were discussed. So what is the case you rely on that says that you have to talk about the pitfalls of pleading guilty without a lawyer? Well, Iowa v. Tovar says that the information a defendant must have to waive counsel intelligently will depend in each case upon the particular facts and circumstances surrounding that case. And so, for example, this Court in Hans's, a 2010 case, and I don't have – didn't have the official site in my brief because there wasn't one yet, but it's 625 F. 3rd, 575. And so this Court held that the record as a whole did show that that individual knew the pitfalls or disadvantages of proceeding without counsel because he had appeared in several hearings without counsel. He had counsel for the main part of the case, but on sentencing, that's where the issue arose, where he didn't have counsel. And this defendant in Hans's had written his own sentencing brief. So he demonstrated a knowledge of the law and a knowledge of the proceedings. Whereas in this case, this – Mr. Morris is basically told that he can have counsel and that lawyer could explain to what's going on in his case, but he's not told anything about what that lawyer could do for him besides explain what's going on. He is pretty clear he wanted to deal. He even said, what's the deal? He wants to plead it and get on with his life. In a situation like that, do we have a case that's close to it? He's experienced at doing this. He's gone through how many sentences where he has life, two or three? He had two previous court convictions from which he got those sentences. And this one is going to be another one for having the shiv. So do we have a case? Do we have a case that says under that circumstance where he indicates he just wants to plead the guilty and get on with his life, that you have to explain that a lawyer would be helpful in what your problem will be without a lawyer? There's not a case specifically on that point, but the law does not – these cases, Tovar and Hans's, don't say that if the defendant wants to proceed without a lawyer, that that's it. It doesn't matter what he knows or doesn't know. The issue is, what does the defendant know? And so he unreasonably wants to do this because he's crazy, we would assert, and the evidence shows that he's quite ill. And the pitfall, the – which case do you rely on that you have to give the pitfalls on every case? There's no case that says you have to. In fact, Tovar says you don't have to give the pitfalls in every case. You have to look at each case individually and see what the defendant knew. And if the evidence or the record shows that he knew the hazards of representing himself, then it doesn't have to be given on the record. Does the record show whether he represented himself in the prior convictions? Oh, no, he did not. I'm sure the record does show that he had counsel. Did he have appointed counsel in those cases? Yes, he did. So he was an experienced defendant who had had counsel appointed for him previously and had aided him in prior decisions. And could the trial judge rely on that and know that in this case? I don't know that the trial judge knew that. I'm sorry. But I don't think that she could rely on it, no, because she's supposed to be looking at what the defendant knows in terms of his right to have counsel in this case. And in 10 minutes, he comes in, he's – it's his initial appearance, he pleads guilty, and he's sentenced to life. Can I ask what you said that he admitted the crime before she gave him any advisements? Where is that? In the transcript on page, I think it's 52 and 53. So the very bottom of 52, and it goes over to 53, she's asking him, do you admit that you suffered these prior convictions? And she goes through each of the prior convictions. After she gave him the advisements, no? No. She's in the middle. She doesn't tell him that. So then after he admits those three things, in the middle of page 54 of my excerpts, it's page 8 of the transcript, she then says, and you do not wish to have an attorney represent you. This is after he has admitted. So you also – so she's telling him, you're admitting that you were convicted of that charge. Yes, ma'am. He admits these are elements of the third strike offense that he has already admitted. If he says he wants to plead guilty, then where does he say that – where does he admit the crime? Page 53. I'm sorry. Oh, this is a stabbing weapon that you're in possession of. You understand you're entering a plea to that charge. Yes. That, I – You're admitting it's true. You're admitting you were convicted of that charge. But I don't actually see where he says that he admitted that he did, in fact, had this stabbing weapon. No, he – He says he wants to enter a plea to it, but where does he say it was true? Your Honor has a good point. But what I was arguing is that he admits that he has these serious prior felony convictions, and those are elements of the third strike offense. He could not have gotten a life sentence for this possession if he hadn't have had those priors. So he admits three priors on the record, and then she asks him, do you want to proceed without an attorney? And she hasn't actually yet told him he has the right to counsel. That doesn't come until later when she completes the advisements. And goes on to take his plea. So – Okay. You're over your time. We'll give you a minute in rebuttal. Thank you very much. Good morning. Juliet Haley, appearing for the Respondent Appellee, Warden Malfi. I want to just begin, because I think counsel, the Court's been engaging in a colloquy that indicates that this Court's job is to sort of look at this in the first instance. And I just want us to pull back and remember that, unlike the U.S. cases in front of us, that this is an APA case. I think we're quite aware of that, thank you. So the question then is whether the State was unreasonable or its decision was unreasonable or contrary to Tovar. Did the State ever make a ruling about this? The – you mean, was there – no, he brought this claim in through habeas, and there were summary adjudication, summary denials. But we know from the recent U.S. Supreme Court case that it is a decision on the merits that still is entitled to deference by this Court. Going back to the – But it looks like, from what I can tell, that they never ruled on this at all, because the one order in here, which is the Superior Court of California, Monterey, says that its claim regarding its competence to stand trial, I can't really tell about this other issue, is more appropriately raised on appeal, which doesn't make a lot of sense, but it's what they said. So it's not at all clear that – I don't know what the remaining two claims were. He – the claims that he raised were the ones that are made by Ms. Luban at this – in front of this Court, which has to do with whether he knowingly – there were more claims than there are now. They've narrowed down. And the superior court issued a written decision saying that because some of these claims were not made on appeal, they're precluded from being made at habeas. However, it went on and also looked at the record and said that the record indicates that he knowingly and intelligently waived his rights. So they did address the merits, and the California supreme court in a petition, an exhaustion petition, summarily denied the merits. Kagan. So that would be true of that issue, but it wouldn't be true of the competence issue. In other words, the issue we were discussing before, you seem to be right. As to the competence issue that we weren't discussing, it seems clear that nobody – no State court ever decided it. I think he did raise the competency question. He raised it, but the Court said that it should have been raised on appeal. So, therefore, it didn't decide it. The superior court didn't decide that one. Right. But we usually go back down to the written decision, so. But on the question, the Tovar question, we'll call it the Tovar question, the question is whether the State court unreasonably applied Tovar in rejecting his claim. And I would just point out, I mean, if you actually look at the colloquy, what you see here is that the defendant is, like, ready to get this over with, and it is the trial court who is holding him back and is saying, I can't just let you do this. I need to take you through the process. And what you'll see here is that it starts off with him saying, I want to get it over with, and her saying, well, we can't, literally, we can't just get it over with, because it's a certain situation. I know you indicated you were serving quite a bit of time, but that's up to you. If you want an attorney, we can appoint one free of charge. They can let you know what's going on in your case. We can set up an appointment for you to talk to him right now. So it's very clear that the trial judge is saying, you can have an attorney talk to you right now. We are not going to go and say that she couldn't have an attorney talk to him right now, but he can right now make an appointment. They can make an appointment, but the point is, is that he can have access to an attorney today. And and Where do you read that in the record? It's at the very beginning of the plea colloquy. It's the first page of the plea colloquy. That's how he starts out. It's on – I'm citing from my brief. Okay. I have it. Page 49. So, you know, when we're talking – I read the record, because it's clear that she said the opposite of what you're saying. She didn't say, I can get you somebody to talk to you right now. She said, I can't get you somebody to talk to you right now. I don't know that it makes any difference, but – What she did was she said, I can appoint an attorney.  There's no constitutional obligation that when you walk into a – Well, that's true. You just should have said the opposite, that's all. I didn't mean to say that she said that somebody can talk to you this minute, but the point was, is that he was going to have access to a lawyer before he moved forward. It was right there. He was – Ms. Lubin's point was that she didn't advise him or let him know that he had a right to a lawyer, that he could have a – speak to a lawyer until after he admitted all the elements of the crime. And if you actually look through the way that the colloquy went with the court, it's that he – and this is not, as Judge Bybee pointed out, this is not a naive defendant. He is experienced. He has been committing crimes since he was a juvenile, and he's already gone through the system. He went through a special circumstance trial. You know, he's run the gamut of knowing how the criminal justice system works. Quite clearly, he can identify the DA. What he says is, you know, he knows how to get the deal done. He said, is that the DA? And she's like, don't – you know, anything you say can be used against you. If you talk to him, well, does he have a deal for me? I want to get this over with. Why is that the competence issue, just briefly? I mean, it seems a pretty good guess, at least, that since he was pretty incompetent before and pretty incompetent after and seemed to have massive brain damage, that he wasn't in the best position to be making these decisions. And he did say a couple of weird things as time went on. Well, with all due respect, Your Honor, he went through a – he went through a special circumstance trial where competency was never raised as an issue. He went through – he went through – by the time he came to plead to this case, he'd been through all the State court systems and he'd been through the district court and never raised competency on any of his – on any of his charges. Completely represented by a lawyer. I mean, if – I mean, I've defended in capital cases, when you go through a special circumstance trial, that's a lot of the experience is trying to come up with any mitigating evidence. You'd think that competency would come up, and competency had never come up. So, I mean, the idea that he'd been, you know, incompetent beforehand and incompetent after is – I just think is completely belied by the record. What we see here is that he went through a health investigation right after or right around the time of this plea, and there was no indication that he was suffering from any sort of psychosis. And he represented himself and was participating in administrative hearings over something that had happened in – But since February 2005 or so, he's been heavily medicated and so on, right? But that is – this happened in 2004. I understand that. I'm quite aware of that. So I think that there's no evidence in the record to suggest that at the time of this plea, he was suffering from any kind of incompetence. Quite to the contrary. And I think that he was probably the sanest person in the room to say, this doesn't make a difference. I'm serving – what? What, I'm going to begin serving this after 120 years and a life without possibility of parole? This is an irrelevant proceeding. What about the representation that that isn't true and it does make a difference? There is no evidence in the record of that effect. And – but what about – I don't know of any. I think that – as I think – as was pointed out, I mean, he is already, you know, in for life without possibility of parole. He's, you know, committed murder and he's committed numerous violent felonies. And I think that probably that his condition is going to be more determined by his mental health than anything else would be my just experiential guess. So I think that, you know, he, you know, was quite sane in his conclusion to get through this proceeding. If there are no further questions, I'll submit it. Thank you very much. I'll just touch on the competence issue. So in this Court's Friedman decision, the defendant was paranoid schizophrenic. And although he could answer questions and speak English like my client, his mental illness prevented him from being competent to waive an attorney, prevented him from interacting meaningfully with any reasonableness with his attorney. And that's what the situation was here. This individual – If your – if your – if your expert witness on this is correct, then he has suffered from these disabilities for a long, long time. Well, her opinion was that the massive brain trauma that he incurred in 1999 triggered his always lurking, ever-present mental illness, familial mental illness. Has he been tried since then, other than this one? No. No, he hasn't. He's, as Judge Berzon said, been heavily medicated, involuntarily medicated. No, no, he means since 1999. Oh, yes, he was – he had this injury in 1999, and I think it's four or five or six or seven months after that, once he's learned to walk and talk again, that he commits the next two crimes, which occurred in very close succession. Yeah. The curious thing is, is that – is that you've got a judge who's exposed to him who can see him and can hear him. You've got lawyers who have dealt with him in two prior crimes. You've got an expert witness now who says the guy's been incompetent for years and years and years, and nobody's thought to ever raise him. Nobody who ever dealt with him in person has ever thought to raise this before. In his penalty trial, in the murder case, he had the same lawyer for both cases. They raised the issue of these brain traumas and the – the frontal lobe damage and that effect – the effect on his – Incompetent to – incompetent for trial? No. That attorney made a tactical decision to proceed on a different defense at trial, and then it was only in the – the – And you have a judge here who is interacting, and insofar as we can tell from the record, which is admitted, you know, that's why we don't make credibility determinations, but he's speaking in complete sentences. It's – it appears from the transcript, again, entirely coherent, other than – other than the weird thing about the gang writing. Well, and his – right, and his communications with the judge also – pretty much everything he says, when the judge asks him, do you want an attorney or do you want to represent yourself, he says, I can. That's not even a correct response. But in his interactions with the psychiatric professionals at the California prison, he talks to them about how the voices told him to stab this inmate. I mean, he's able to speak about this in full sentences, but that doesn't change the fact that he's very severely mentally ill, so that the doctors who are incarcerating him felt that he's not competent to make a decision about his medication. The – the likelihood that while he was locked up in the SHU, which is what happened immediately after this stabbing incident, and – until he was brought to CSP Sacramento, he was basically in the SHU, and the – the professionals at that prison go and look in and ask him one or two questions. Are you hearing voices? Do you want to kill yourself? No? Okay, check, check. This guy's competent. And then they go on, and maybe a week later, they check again to see if he's not climbing the walls. So if he doesn't overtly demonstrate that kind of behavior, then the quick cursory look by the people at Corcoran doesn't really evaluate him. And so when he got to CSP Sacramento, the court may be familiar with them. They have a big psych unit, and they have highly qualified people. And so it was there that they – he came to them and expressed what was – gave him a battery of tests and determined that, in fact, he's got this very severe psychosis. Okay. Thank you very much. Thank you, both of you, for a useful argument. The case of Morris v. Malfi is submitted. And we'll
judges: Wallace, Berzon, Bybee, Cjj